YAMAHA MOTOR CORP., U. S. A., ET AL. *v.*
CALHOUN ET AL., INDIVIDUALLY AND AS
ADMINISTRATORS OF THE ESTATE OF
CALHOUN, DECEASED

No. 94–1387.   Argued October 31, 1995—Decided January 9, 1996

GINSBURG, J., delivered the opinion for a unanimous Court.

*James W. Bartlett III* argued the cause for petitioners. With him on the briefs were *Jonathan Dryer, William R. Hoffman,* and *Francis P. Manchisi.*

*Paul A. Engelmayer* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Days, Assistant Attorney General Hunger, Deputy Solicitor General Bender, David V. Hutchinson,* and *Edward Himmelfarb.*

*Alan B. Morrison* argued the cause for respondents. With him on the brief were *William J. Taylor* and *Timothy R. Chapin.**

JUSTICE GINSBURG delivered the opinion of the Court.

Twelve-year-old Natalie Calhoun was killed in a jet ski accident on July 6, 1989. At the time of her death, she was vacationing with family friends at a beach-front resort in Puerto Rico. Alleging that the jet ski was defectively de-

---

*Briefs of *amici curiae* urging reversal were filed for the American Steamship Owners Mutual Protection and Indemnity Association, Inc., et al. by *Michael F. Sturley;* for the Maritime Law Association of the United States by *Warren J. Marwedel, Dennis Minichello,* and *Chester D. Hooper;* and for the National Marine Manufacturers Association by *George J. Koelzer* and *Joshua S. Force.*

Briefs of *amici curiae* urging affirmance were filed for the Association of Trial Lawyers of America by *Ross Diamond III* and *Pamela Liapakis;* and for the National Conference of State Legislatures et al. by *Richard Ruda* and *James I. Crowley.*

signed or made, Natalie's parents sought to recover from the manufacturer pursuant to state survival and wrongful-death statutes. The manufacturer contended that state remedies could not be applied because Natalie died on navigable waters; federal, judge-declared maritime law, the manufacturer urged, controlled to the exclusion of state law.

Traditionally, state remedies have been applied in accident cases of this order—maritime wrongful-death cases in which no federal statute specifies the appropriate relief and the decedent was not a seaman, longshore worker, or person otherwise engaged in a maritime trade. We hold, in accord with the United States Court of Appeals for the Third Circuit, that state remedies remain applicable in such cases and have not been displaced by the federal maritime wrongful-death action recognized in *Moragne* v. *States Marine Lines, Inc.*, 398 U. S. 375 (1970).

## I

Natalie Calhoun, the 12-year-old daughter of respondents Lucien and Robin Calhoun, died in a tragic accident on July 6, 1989. On vacation with family friends at a resort hotel in Puerto Rico, Natalie had rented a "WaveJammer" jet ski manufactured by Yamaha Motor Company, Ltd., and distributed by Yamaha Motor Corporation, U. S. A. (collectively, Yamaha), the petitioners in this case. While riding the WaveJammer, Natalie slammed into a vessel anchored in the waters off the hotel frontage, and was killed.

The Calhouns, individually and in their capacities as administrators of their daughter's estate, sued Yamaha in the United States District Court for the Eastern District of Pennsylvania. Invoking Pennsylvania's wrongful-death and survival statutes, 42 Pa. Cons. Stat. §§ 8301–8302 (1982 and Supp. 1995), the Calhouns asserted several bases for recovery (including negligence, strict liability, and breach of implied warranties), and sought damages for lost future earnings, loss of society, loss of support and services, and funeral expenses, as well as punitive damages. They grounded fed-

eral jurisdiction on both diversity of citizenship, 28 U. S. C. § 1332,[1] and admiralty, 28 U. S. C. § 1333.

Yamaha moved for partial summary judgment, arguing that the federal maritime wrongful-death action this Court recognized in *Moragne* v. *States Marine Lines, Inc.*, 398 U. S. 375 (1970), provided the exclusive basis for recovery, displacing all remedies afforded by state law. Under *Moragne*, Yamaha contended, the Calhouns could recover as damages only Natalie's funeral expenses. The District Court agreed with Yamaha that *Moragne*'s maritime death action displaced state remedies; the court held, however, that loss of society and loss of support and services were compensable under *Moragne*.

Both sides asked the District Court to present questions for immediate interlocutory appeal pursuant to 28 U. S. C. § 1292(b). The District Court granted the parties' requests, and in its § 1292(b) certifying order stated:

"Natalie Calhoun, the minor child of plaintiffs Lucien B. Calhoun and Robin L. Calhoun, who are Pennsylvania residents, was killed in an accident not far off shore in Puerto Rico, in the territorial waters of the United States. Plaintiffs have brought a diversity suit against, *inter alia*, defendants Yamaha Motor Corporation, U. S. A. and Yamaha Motor Co., Ltd. The counts of the complaint directed against the Yamaha defendants allege that the accident was caused by a defect or defects in a Yamaha jet ski which Natalie Calhoun had rented and was using at the time of the fatal accident. Those counts sound in negligence, in strict liability, and in implied warranties of merchantability and fitness. The district court has concluded that admiralty jurisdiction attaches to these several counts and that they

[1] The Calhouns are citizens of Pennsylvania. Yamaha Motor Corporation, U. S. A., is incorporated and has its principal place of business in California; Yamaha Motor Company, Ltd., is incorporated and has its principal place of business in Japan.

constitute a federal maritime cause of action. The questions of law certified to the Court of Appeals are whether, pursuant to such a maritime cause of action, plaintiffs may seek to recover (1) damages for the loss of the society of their deceased minor child, (2) damages for the loss of their child's future earnings, and (3) punitive damages." App. to Pet. for Cert. A–78.

Although the Court of Appeals granted the interlocutory review petition, the panel to which the appeal was assigned did not reach the questions presented in the certified order, for it determined that an anterior issue was pivotal. The District Court, as just recounted, had concluded that any damages the Calhouns might recover from Yamaha would be governed exclusively by federal maritime law. But the Third Circuit panel questioned that conclusion and inquired whether state wrongful-death and survival statutes supplied the remedial prescriptions for the Calhouns' complaint. The appellate panel asked whether the state remedies endured or were "displaced by a federal maritime rule of decision." 40 F. 3d 622, 624 (1994). Ultimately, the Court of Appeals ruled that state-law remedies apply in this case. *Id.*, at 644.

## II

In our order granting certiorari, we asked the parties to brief a preliminary question: "Under 28 U. S. C. § 1292(b), can the courts of appeals exercise jurisdiction over any question that is included within the order that contains the controlling question of law identified by the district court?" 514 U. S. 1126 (1995). The answer to that question, we are satisfied, is yes.

Section 1292(b) provides, in pertinent part:

"When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that *such order* involves a controlling question of law as to which there is substantial ground

for difference of opinion and that an immediate appeal *from the order* may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals . . . may thereupon, in its discretion, permit an appeal to be taken *from such order,* if application is made to it within ten days after the entry of the order." (Emphasis added.)

As the text of § 1292(b) indicates, appellate jurisdiction applies to the *order* certified to the court of appeals, and is not tied to the particular question formulated by the district court. The court of appeals may not reach beyond the certified order to address other orders made in the case. *United States* v. *Stanley,* 483 U. S. 669, 677 (1987). But the appellate court may address any issue fairly included within the certified order because "it is the *order* that is appealable, and not the controlling question identified by the district court." 9 J. Moore & B. Ward, Moore's Federal Practice ¶ 110.25[1], p. 300 (2d ed. 1995). See also 16 C. Wright, A. Miller, E. Cooper, & E. Gressman, Federal Practice and Procedure § 3929, pp. 144–145 (1977) ("[T]he court of appeals may review the entire order, either to consider a question different than the one certified as controlling or to decide the case despite the lack of any identified controlling question."); Note, Interlocutory Appeals in the Federal Courts Under 28 U. S. C. § 1292(b), 88 Harv. L. Rev. 607, 628–629 (1975) ("scope of review [includes] all issues material to the order in question").

We therefore proceed to the issue on which certiorari was granted: Does the federal maritime claim for wrongful death recognized in *Moragne* supply the exclusive remedy in cases involving the deaths of nonseafarers[2] in territorial waters?

---

[2] By "nonseafarers," we mean persons who are neither seamen covered by the Jones Act, 46 U. S. C. App. § 688 (1988 ed.), nor longshore workers covered by the Longshore and Harbor Workers' Compensation Act, 33 U. S. C. § 901 *et seq.*

## III

Because this case involves a watercraft collision on navigable waters, it falls within admiralty's domain. See *Sisson* v. *Ruby*, 497 U. S. 358, 361–367 (1990); *Foremost Ins. Co.* v. *Richardson*, 457 U. S. 668, 677 (1982). "With admiralty jurisdiction," we have often said, "comes the application of substantive admiralty law." *East River S. S. Corp.* v. *Transamerica Delaval Inc.*, 476 U. S. 858, 864 (1986). The exercise of admiralty jurisdiction, however, "does not result in automatic displacement of state law." *Jerome B. Grubart, Inc.* v. *Great Lakes Dredge & Dock Co.*, 513 U. S. 527, 545 (1995). Indeed, prior to *Moragne*, federal admiralty courts routinely applied state wrongful-death and survival statutes in maritime accident cases.[3] The question before us is whether *Moragne* should be read to stop that practice.

Our review of maritime wrongful-death law begins with *The Harrisburg*, 119 U. S. 199 (1886), where we held that the general maritime law (a species of judge-made federal common law) did not afford a cause of action for wrongful death. The *Harrisburg* Court said that wrongful-death actions are statutory and may not be created by judicial decree. The Court did not question the soundness of this view, or examine the historical justifications that account for it. Instead, the Court merely noted that common law in the United States, like the common law of England, did not allow recovery "for an injury which results in death," *id.*, at 204 (internal quotation marks omitted), and that no country had "adopted a different rule on this subject for the sea from that which it maintains on the land," *id.*, at 213. The Court did not consider itself free to chart a different course by crafting a judge-made wrongful-death action under our maritime law.

Federal admiralty courts tempered the harshness of *The Harrisburg*'s rule by allowing recovery under state

---

[3] Throughout this opinion, for economy, we use the term wrongful-death remedies or statutes to include survival statutes.

wrongful-death statutes. See, *e. g., The Hamilton,* 207 U. S. 398 (1907); *The City of Norwalk,* 55 F. 98 (SDNY 1893).[4] We reaffirmed this practice in *Western Fuel Co.* v. *Garcia,* 257 U. S. 233 (1921), by holding that California's wrongful-death statute governed a suit brought by the widow of a maritime worker killed in that State's territorial waters. Though we had generally refused to give effect to state laws regarded as inconsonant with the substance of federal maritime law, we concluded that extending state wrongful-death statutes to fatal accidents in territorial waters was compatible with substantive maritime policies: "The subject is maritime and local in character and the specified modification of or supplement to the rule applied in admiralty courts . . . will not work material prejudice to the characteristic features of the general maritime law, nor interfere with the proper harmony and uniformity of that law in its international and interstate relations." *Id.,* at 242.[5] On similar reasoning, we also held that state survival statutes may be applied in cases arising out of accidents in territorial waters. See *Just* v. *Chambers,* 312 U. S. 383, 391–392 (1941).

State wrongful-death statutes proved an adequate supplement to federal maritime law, until a series of this Court's

---

[4] Congress also mitigated the impact of *The Harrisburg* by enacting two statutes affording recovery for wrongful death. In 1920, Congress passed the Death on the High Seas Act (DOHSA), 46 U. S. C. App. § 761 *et seq.* (1988 ed.), which provides a federal claim for wrongful death occurring more than three nautical miles from the shore of any State or Territory. In that same year, Congress also passed the Jones Act, 46 U. S. C. App. § 688 (1988 ed.), which provides a wrongful-death claim to the survivors of seamen killed in the course of their employment, whether on the high seas or in territorial waters.

[5] Indeed, years before *The Harrisburg,* this Court rendered a pathmarking decision, *Steamboat Co.* v. *Chase,* 16 Wall. 522 (1873). In *Steamboat,* the Court upheld, under the "saving-to-suitors" proviso of the Judiciary Act of 1789 (surviving currently in 28 U. S. C. § 1333(1)), a state court's application of the State's wrongful-death statute to a fatality caused by a collision in territorial waters between defendants' steamboat and a sailboat in which plaintiff's decedent was passing.

decisions transformed the maritime doctrine of unseaworthiness into a strict-liability rule. Prior to 1944, unseaworthiness "was an obscure and relatively little used" liability standard, largely because "a shipowner's duty at that time was only to use due diligence to provide a seaworthy ship." *Miles* v. *Apex Marine Corp.*, 498 U. S. 19, 25 (1990) (internal quotation marks omitted). See also *Moragne*, 398 U. S., at 398–399. *Mahnich* v. *Southern S. S. Co.*, 321 U. S. 96 (1944), however, notably expanded a shipowner's liability to injured seamen by imposing a nondelegable duty "to furnish a vessel and appurtenances reasonably fit for their intended use." *Mitchell* v. *Trawler Racer, Inc.*, 362 U. S. 539, 550 (1960). The duty imposed was absolute; failure to supply a safe ship resulted in liability "irrespective of fault and irrespective of the intervening negligence of crew members." *Miles*, 498 U. S., at 25. The unseaworthiness doctrine thus became a "species of liability without fault," *Seas Shipping Co.* v. *Sieracki*, 328 U. S. 85, 94 (1946), and soon eclipsed ordinary negligence as the primary basis of recovery when a seafarer was injured or killed. *Miles*, 498 U. S., at 25–26.[6]

The disparity between the unseaworthiness doctrine's strict-liability standard and negligence-based state wrongful-death statutes figured prominently in our landmark *Moragne* decision. Petsonella Moragne, the widow of a longshore worker killed in Florida's territorial waters, brought suit under Florida's wrongful-death and survival statutes, alleging both negligence and unseaworthiness.

---

[6] The Court extended the duty to provide a seaworthy ship, once owed only to seamen, to longshore workers in *Seas Shipping Co.* v. *Sieracki*, 328 U. S. 85 (1946). Congress effectively overruled this extension in its 1972 amendments to the Longshore and Harbor Workers' Compensation Act, 33 U. S. C. §901 *et seq.* See §905(b). We have thus far declined to extend the duty further. See *Kermarec* v. *Compagnie Generale Transatlantique*, 358 U. S. 625, 629 (1959) (unseaworthiness doctrine inapplicable to invitee aboard vessel).

The District Court dismissed the claim for wrongful death based on unseaworthiness, citing this Court's decision in *The Tungus* v. *Skovgaard*, 358 U. S. 588 (1959). There, a sharply divided Court held that "when admiralty adopts a State's right of action for wrongful death, it must enforce the right as an integrated whole, with whatever conditions and limitations the creating State has attached." *Id.*, at 592. Thus, in wrongful-death actions involving fatalities in territorial waters, state statutes provided the standard of liability as well as the remedial regime. Because the Florida Supreme Court had previously held that Florida's wrongful-death statute did not encompass unseaworthiness as a basis of liability, the Court of Appeals affirmed the dismissal of Moragne's unseaworthiness claim. See *Moragne*, 398 U. S., at 377.

The Court acknowledged in *Moragne* that *The Tungus* had led to considerable uncertainty over the role state law should play in remedying deaths in territorial waters, but concluded that "the primary source of the confusion is not to be found in *The Tungus*, but in *The Harrisburg*." 398 U. S., at 378. Upon reexamining the soundness of *The Harrisburg*, we decided that its holding, "somewhat dubious even when rendered, is such an unjustifiable anomaly in the present maritime law that it should no longer be followed." 398 U. S., at 378. Accordingly, the Court overruled *The Harrisburg* and held that an action "lie[s] under general maritime law for death caused by violation of maritime duties." 398 U. S., at 409.

## IV

Yamaha argues that *Moragne*—despite its focus on "maritime duties" owed to maritime workers—covers the waters, creating a uniform federal maritime remedy for all deaths occurring in state territorial waters, and ousting all previously available state remedies. In Yamaha's view, state remedies can no longer supplement general maritime law

(as they routinely did before *Moragne*), because *Moragne* launched a solitary federal scheme.[7]  Yamaha's reading of *Moragne* is not without force; in several contexts, we have recognized that vindication of maritime policies demanded uniform adherence to a federal rule of decision, with no leeway for variation or supplementation by state law.  See, *e. g., Kossick* v. *United Fruit Co.*, 365 U. S. 731, 742 (1961) (federal maritime rule validating oral contracts precluded application of state Statute of Frauds); *Pope & Talbot, Inc.* v. *Hawn*, 346 U. S. 406, 409 (1953) (admiralty's comparative negligence rule barred application of state contributory negligence rule); *Garrett* v. *Moore-McCormack Co.*, 317 U. S. 239, 248–249 (1942) (federal maritime rule allocating burden of proof displaced conflicting state rule).[8]  In addition, Ya-

---

[7] If *Moragne's* wrongful-death action did not extend to nonseafarers like Natalie, one could hardly argue that *Moragne* displaced the state-law remedies the Calhouns seek.  Lower courts have held that *Moragne's* wrongful-death action extends to nonseafarers.  See, *e. g., Sutton* v. *Earles*, 26 F. 3d 903 (CA9 1994) (recreational boater); *Wahlstrom* v. *Kawasaki Heavy Industries, Ltd.*, 4 F. 3d 1084 (CA2 1993) (jet skier), cert. denied, 510 U. S. 1114 (1994).  We assume, for purposes of this decision, the correctness of that position.  Similarly, as in prior encounters, we assume without deciding that *Moragne* also provides a survival action.  See *Miles* v. *Apex Marine Corp.*, 498 U. S. 19, 34 (1990).  The question we confront is not what *Moragne* added to the remedial arsenal in maritime cases, but what, if anything, it removed from admiralty's stock.

[8] The federal cast of admiralty law, we have observed, means that "state law must yield to the needs of a uniform federal maritime law when this Court finds inroads on a harmonious system[,] [b]ut this limitation still leaves the States a wide scope."  *Romero* v. *International Terminal Operating Co.*, 358 U. S. 354, 373 (1959).  Our precedent does not precisely delineate that scope.  As we recently acknowledged, "[i]t would be idle to pretend that the line separating permissible from impermissible state regulation is readily discernible in our admiralty jurisprudence."  *American Dredging Co.* v. *Miller*, 510 U. S. 443, 452 (1994).  We attempt no grand synthesis or reconciliation of our precedent today, but confine our inquiry to the modest question whether it was *Moragne's* design to terminate recourse to state remedies when nonseafarers meet death in territorial waters.

maha correctly points out that uniformity concerns informed our decision in *Moragne.*

The uniformity concerns that prompted us to overrule *The Harrisburg,* however, were of a different order than those invoked by Yamaha. *Moragne* did not reexamine the soundness of *The Harrisburg* out of concern that state monetary awards in maritime wrongful-death cases were excessive, or that variations in the remedies afforded by the States threatened to interfere with the harmonious operation of maritime law. Variations of this sort had long been deemed compatible with federal maritime interests. See *Western Fuel,* 257 U. S., at 242. The uniformity concern that drove our decision in *Moragne* related, instead, to the availability of unseaworthiness as a basis of liability.

By 1970, when *Moragne* was decided, claims premised on unseaworthiness had become "the principal vehicle for recovery" by seamen and other maritime workers injured or killed in the course of their employment. *Moragne,* 398 U. S., at 399. But with *The Harrisburg* in place, troubling anomalies had developed that many times precluded the survivors of maritime workers from recovering for deaths caused by an unseaworthy vessel. The *Moragne* Court identified three anomalies and concluded they could no longer be tolerated.

First, the Court noted that "within territorial waters, identical conduct violating federal law (here the furnishing of an unseaworthy vessel) produces liability if the victim is merely injured, but frequently not if he is killed." 398 U. S., at 395. This occurred because in nonfatal injury cases, state substantive liability standards were superseded by federal maritime law, see *Kermarec* v. *Compagnie Generale Transatlantique,* 358 U. S. 625, 628 (1959); *Pope & Talbot,* 346 U. S., at 409, which provided for maritime worker recovery based on unseaworthiness. But if the same worker met death in the territorial waters of a State whose wrongful-death statute did not encompass unseaworthiness (as was the

case in *Moragne* itself), the survivors could not proceed under that generous standard of liability. See *The Tungus*, 358 U. S., at 592–593.

Second, we explained in *Moragne* that "identical breaches of the duty to provide a seaworthy ship, resulting in death, produce liability outside the three-mile limit . . . but not within the territorial waters of a State whose local statute excludes unseaworthiness claims." 398 U. S., at 395. This occurred because survivors of a maritime worker killed on the high seas could sue for wrongful death under the Death on the High Seas Act (DOHSA), 46 U. S. C. App. § 761 *et seq.* (1988 ed.), which encompasses unseaworthiness as a basis of liability. *Moragne*, 398 U. S., at 395 (citing *Kernan* v. *American Dredging Co.*, 355 U. S. 426, 430, n. 4 (1958)).

Finally, we pointed out that "a true seaman [a member of a ship's company] . . . is provided no remedy for death caused by unseaworthiness within territorial waters, while a longshoreman, to whom the duty of seaworthiness was extended only because he performs work traditionally done by seamen, does have such a remedy when allowed by a state statute." 398 U. S., at 395–396. This anomaly stemmed from the Court's rulings in *Lindgren* v. *United States*, 281 U. S. 38 (1930), and *Gillespie* v. *United States Steel Corp.*, 379 U. S. 148 (1964), that the Jones Act, 46 U. S. C. App. § 688 (1988 ed.), which provides only a negligence-based claim for the wrongful death of seamen, precludes any state remedy, even one accommodating unseaworthiness. As a result, at the time *Moragne* was decided, the survivors of a longshore worker killed in the territorial waters of a State whose wrongful-death statute incorporated unseaworthiness could sue under that theory, but the survivors of a similarly situated seaman could not.[9]

---

[9] As noted earlier, unseaworthiness recovery by longshore workers was terminated by Congress in its 1972 amendments to the Longshore and Harbor Workers' Compensation Act, 33 U. S. C. § 901 *et seq.* See § 905(b).

The anomalies described in *Moragne* relate to ships and the workers who serve them, and to a distinctly maritime substantive concept—the unseaworthiness doctrine. The Court surely meant to "assure uniform vindication of federal policies," 398 U. S., at 401, with respect to the matters it examined. The law as it developed under *The Harrisburg* had forced on the States more than they could bear—the task of "provid[ing] the sole remedy" in cases that did not involve "traditional common-law concepts," but "concepts peculiar to maritime law." 398 U. S., at 401, n. 15 (internal quotation marks omitted). Discarding *The Harrisburg* and declaring a wrongful-death right of action under general maritime law, the Court concluded, would "remov[e] the tensions and discrepancies" occasioned by the need "to accommodate state remedial statutes to exclusively maritime substantive concepts." 398 U. S., at 401.[10]

*Moragne*, in sum, centered on the extension of relief, not on the contraction of remedies. The decision recalled that " 'it better becomes the humane and liberal character of proceedings in admiralty to give than to withhold the remedy, when not required to withhold it by established and inflexible rules.' " *Id.*, at 387 (quoting *The Sea Gull*, 21 F. Cas. 909, 910 (No. 12,578) (CC Md. 1865) (Chase, C. J.)). The Court tied Petsonella Moragne's plea based on the unseaworthiness

---

[10] The Court might have simply overruled *The Tungus*, see *supra*, at 209, thus permitting plaintiffs to rely on federal liability standards to obtain state wrongful-death remedies. The petitioner in *Moragne*, widow of a longshore worker, had urged that course when she sought certiorari. See *Moragne* v. *States Marine Lines, Inc.*, 398 U. S. 375, 378, n. 1 (1970). But training *Moragne* solely on *The Tungus* would have left untouched the survivors of seamen, who remain blocked by the Jones Act from pursuing state wrongful-death claims—whether under a theory of negligence or unseaworthiness. See *Gillespie* v. *United States Steel Corp.*, 379 U. S. 148, 154–155 (1964). Thus, nothing short of a federal maritime right of action for wrongful death could have achieved uniform access by seafarers to the unseaworthiness doctrine, the Court's driving concern in *Moragne*. See 398 U. S., at 396, n. 12.

of the vessel to a federal right-of-action anchor,[11] but notably left in place the negligence claim she had stated under Florida's law. See 398 U. S., at 376–377.[12]

Our understanding of *Moragne* accords with that of the Third Circuit, which Judge Becker set out as follows:

> "*Moragne* . . . showed no hostility to concurrent application of state wrongful-death statutes. Indeed, to read into *Moragne* the idea that it was placing a ceiling on recovery for wrongful death, rather than a floor, is somewhat ahistorical. The *Moragne* cause of action was in many respects a gap-filling measure to ensure that seamen (and their survivors) would all be treated alike. The 'humane and liberal' purpose underlying the general maritime remedy of *Moragne* was driven by the idea that survivors of seamen killed in state territorial waters should not have been barred from recovery simply because the tort system of the particular state in which a seaman died did not incorporate special maritime doctrines. It is difficult to see how this purpose can be taken as an intent to preclude the operation of state laws that do supply a remedy." 40 F. 3d, at 641–642 (citation omitted).

We have reasoned similarly in *Sun Ship, Inc.* v. *Pennsylvania,* 447 U. S. 715 (1980), where we held that a State may apply its workers' compensation scheme to land-based injuries that fall within the compass of the Longshore and Har-

---

[11] While unseaworthiness was the doctrine immediately at stake in *Moragne,* the right of action, as stated in the Court's opinion, is "for death caused by violation of maritime duties." *Id.,* at 409. See *East River S. S. Corp.* v. *Transamerica Delaval Inc.,* 476 U. S. 858, 865 (1986) (maritime law incorporates strict product liability); *Kermarec,* 358 U. S., at 630 (negligence). See also G. Gilmore & C. Black, The Law of Admiralty 368 (2d ed. 1975).

[12] *Moragne* was entertained by the Court of Appeals pursuant to a 28 U. S. C. § 1292(b) certification directed to the District Court's order dismissing the unseaworthiness claim. See 398 U. S., at 376.

bor Workers' Compensation Act, 33 U. S. C. § 901 *et seq.* See *Sun Ship,* 447 U. S., at 724 (a State's remedial scheme might be "more generous than federal law" but nevertheless could apply because Congress indicated no concern "about a disparity between adequate federal benefits and *superior* state benefits") (emphasis in original).[13]

When Congress has prescribed a comprehensive tort recovery regime to be uniformly applied, there is, we have generally recognized, no cause for enlargement of the damages statutorily provided. See *Miles,* 498 U. S., at 30–36 (Jones Act, rather than general maritime law, determines damages recoverable in action for wrongful death of seamen); *Offshore Logistics, Inc.* v. *Tallentire,* 477 U. S. 207, 232 (1986) (DOHSA, which limits damages to pecuniary losses, may not be supplemented by nonpecuniary damages under a state wrongful-death statute); *Mobil Oil Corp.* v. *Higginbotham,* 436 U. S. 618, 624–625 (1978) (DOHSA precludes damages for loss of society under general maritime law). But Congress has not prescribed remedies for the wrongful deaths of non-seafarers in territorial waters. See *Miles,* 498 U. S., at 31. There is, however, a relevant congressional disposition. Section 7 of DOHSA states: "The provisions of any State statute giving or regulating rights of action or remedies for death

[13] Federal maritime law has long accommodated the States' interest in regulating maritime affairs within their territorial waters. See, *e. g., Just* v. *Chambers,* 312 U. S. 383, 390 (1941) ("maritime law [is] not a complete and perfect system"; "a considerable body of municipal law . . . underlies . . . its administration"). States have thus traditionally contributed to the provision of environmental and safety standards for maritime activities. See, *e. g., Askew* v. *American Waterways Operators, Inc.,* 411 U. S. 325 (1973) (oil pollution); *Huron Portland Cement Co.* v. *Detroit,* 362 U. S. 440 (1960) (air pollution); *Kelly* v. *Washington ex rel. Foss Co.,* 302 U. S. 1 (1937) (safety inspection); *Cooley* v. *Board of Wardens of Port of Philadelphia ex rel. Soc. for Relief of Distressed Pilots,* 12 How. 299 (1852) (pilotage regulation). Permissible state regulation, we have recognized, must be consistent with federal maritime principles and policies. See *Romero,* 358 U. S., at 373–374.

shall not be affected by this chapter." 46 U. S. C. App. § 767. This statement, by its terms, simply stops DOHSA from displacing state law in territorial waters. See *Miles*, 498 U. S., at 25; *Tallentire*, 477 U. S., at 224–225; *Moragne*, 398 U. S., at 397–398. Taking into account what Congress sought to achieve, we preserve the application of state statutes to deaths within territorial waters.

\* \* \*

For the reasons stated, we hold that the damages available for the jet ski death of Natalie Calhoun are properly governed by state law.[14] The judgment of the Court of Appeals for the Third Circuit is accordingly

*Affirmed.*

---

[14] The Third Circuit left for initial consideration by the District Court the question whether Pennsylvania's wrongful-death remedies or Puerto Rico's apply. 40 F. 3d 622, 644 (1994). The Court of Appeals also left open, as do we, the source—federal or state—of the standards governing liability, as distinguished from the rules on remedies. We thus reserve for another day reconciliation of the maritime personal injury decisions that rejected state substantive liability standards, and the maritime wrongful-death cases in which state law has held sway. Compare *Kermarec*, 358 U. S., at 628 (personal injury); *Pope & Talbot, Inc.* v. *Hawn*, 346 U. S. 406, 409 (1953) (same), with *Hess* v. *United States*, 361 U. S. 314, 319 (1960) (wrongful death); *The Tungus* v. *Skovgaard*, 358 U. S. 588, 592–594 (1959) (same).