Lucien B. **CALHOUN** and Robin Calhoun, Individually and as Administrators of the Estate of Natalie K. Calhoun, Deceased

v.

**YAMAHA MOTOR CORPORATION,**
USA and Yamaha Motor
Company, Ltd.

No. CIV. A. 90–4295.

United States District Court,
E.D. Pennsylvania.

March 19, 1999.

William J. Taylor, Saul, Ewing, Remick & Saul LLP, Philadelphia, PA, for Lucien B. Calhoun, Robin L. Calhoun, individually and as Administrators of the Estate of Natalie K. Calhoun, deceased, Plaintiffs.

Jonathan Dryer, Wilson, Elser, Moskowitz, Edelman & Dicker, William R. Hoffman, Wilson, Elser, Moskowitz, Edelman & Dicker, Philadelphia, PA, for Yamaha Motor Corporation, U.S.A., Yamaha Motor Co., Ltd., ABC Corporations, XYZ Partnerships, Defendants.

## OPINION

POLLAK, District Judge.

This case arises from the tragic death, in the offshore waters of Puerto Rico, of Natalie Calhoun, the minor daughter of Lucien B. Calhoun and Robin L. Calhoun. In the summer of 1989, Natalie, twelve, who lived with her parents in Pennsylvania, went on a vacation trip to Puerto Rico with a friend and her friend's parents. During their stay at a resort hotel, Natalie rented a "Wavejammer" jet ski. The Wavejammer hit a vessel at anchor near the beach. Natalie was killed.

Invoking Pennsylvania law, Natalie's parents brought a combined wrongful death and survival action in this court against Yamaha Motor Company, Ltd., a Japanese corporation, which is the manufacturer of Wavejammer jet skis, and Yamaha Motor Corporation, U.S.A., a California corporation, which is the American distributor of Wavejammers. (The defendants are hereinafter collectively referred to as "Yamaha"). The complaint alleged defects in the Wavejammer, and attributed liability to Yamaha on the basis of negligence, strict liability, and breach of implied warranties of merchantability and fitness.

Plaintiffs contended that, since the parties were of diverse citizenship, the suit should be treated as a conventional diversity action, to be tried under Pennsylvania

law in conformity with the requirements of the *Erie* doctrine. *Erie R. Co. v. Tompkins,* 304 .U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Klaxon v. Stentor Electric Manufacturing Co., Inc.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Yamaha contended that, since the suit arose from an accident occurring in the territorial waters of the United States, the suit should, notwithstanding that Natalie was neither a seaman nor a longshoreman (i.e., notwithstanding that she was not a "seafarer"), be regarded as embraced by this court's admiralty jurisdiction. More particularly, Yamaha contended that the suit should, pursuant to *Moragne v. States Marine Lines, Inc.,* 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970), be treated as a federal maritime claim. I concluded that Yamaha was correct in arguing that the Calhouns' suit sounded not in diversity but in admiralty. Pursuant to that jurisdictional ruling, I undertook to fashion the cognizable damages claims in conformity with what I determined to be appropriate and uniform federal maritime standards. Specifically, I determined that—contrary to Yamaha's view—the Calhouns could undertake to sue for loss of Natalie's society, but—contrary to the Calhouns' view—they could not sue for Natalie's lost future earnings or for punitive damages. 1993 WL 216238, 1993 U.S. Dist. LEXIS 8267 (E.D.Pa.1993). At the instance of the parties, these rulings were certified for interlocutory review, pursuant to 28 U.S.C. § 1292(b).

The Court of Appeals, in a detailed and closely reasoned opinion, reversed, 40 F.3d 622 (3d Cir.1994). Concluding that this court had misconstrued *Moragne* and other pertinent Supreme Court decisions in holding that a uniform federal remedial regime was intended to govern litigation arising out of allegedly tortious deaths of nonseafarers in territorial waters, the Court of Appeals ruled that state remedial law was to govern the Calhouns' suit against Yamaha. However, the Court of Appeals left it to this court to determine, in the first instance, the choice-of-law question of which jurisdiction's—i.e., Pennsylvania's or Puerto Rico's—remedial regime should apply.

The Supreme Court, on certiorari, affirmed in a unanimous opinion. *Yamaha Motor Corp., U.S.A. v. Calhoun,* 516 U.S. 199, 116 S.Ct. 619, 133 L.Ed.2d 578 (1996). After reviewing its own major cases, including *Moragne,* and after careful analysis of the interplay between its cases and three major federal statutes—the Death on the High Seas Act, 46 U.S.C. § 761 *et seq.;* the Jones Act, 46 U.S.C. § 688 *et seq.;* and the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 901 *et seq.*—the Court ruled that "[t]aking into account what Congress sought to achieve, we preserve the application of state statutes to deaths within territorial waters." *Id.* at 216, 116 S.Ct. 619. Then, said the Court, in the final paragraphs of the opinion, "[f]or the reasons stated, we hold that the damages available for the jet ski death of Natalie Calhoun are properly governed by state law." *Id.*

The Court, in the opinion's closing footnote, pointed out that "[t]he Third Circuit left for initial consideration by the District Court whether Pennsylvania's wrongful-death remedies or Puerto Rico's apply." *Id.* at 216 n. 14, 116 S.Ct. 619.

The opinion's closing footnote also identified a related question whose disposition the Supreme Court—like the Court of Appeals—felt could be deferred (*id.*):

The Court of Appeals also left open, as do we, the source—federal or state—of the standards governing liability, as distinguished from the rules on remedies. We thus reserve for another day reconciliation of the maritime personal injury decisions that rejected state substantive liability standards, and the maritime wrongful-death cases in which state law has held sway. *Compare Kermarec,* 358 U.S., at 628 [, 79 S.Ct. 406] (personal injury); *Pope & Talbot, Inc. v. Hawn,* 346 U.S. 406, 409[, 74 S.Ct. 202, 98 L.Ed. 143] (1953) (same), with *Hess v. United States,* 361 U.S. 314, 319[, 80 S.Ct. 341, 4

L.Ed.2d 305] (1960). (wrongful death); *The Tungus v. Skovgaard,* 358 U.S. 588, 592–594[, 79 S.Ct. 503, 3 L.Ed.2d 524] (1959) (same).

## II.

As the foregoing recital explains, two questions were remitted to this court by the Court of Appeals and the Supreme Court. The first question is which jurisdiction's remedial regime—that prescribed by the law of remedies of Puerto Rico or that prescribed by the law of remedies of Pennsylvania—frames the damages claims advanced by the Calhouns. The second question is whether the source of the Calhouns' substantive claims is federal maritime law or state law. If the second question yields the answer that state substantive law governs, a further question is presented: Is the applicable substantive law that of Pennsylvania (the home jurisdiction of Natalie Calhoun and of her parents, and the jurisdiction in which this litigation is being conducted), or that of Puerto Rico (the jurisdiction in which Natalie's tragic death occurred).[1]

The first of these questions was addressed by this court last fall. After briefing and argument I announced a provisional ruling—"provisional" in the sense that it was not then embodied in an order. See Transcript of Oral Argument, Sept. 23, 1998. At a subsequent hearing a week later I stated that, after giving counsel the opportunity to file supplemental briefs, I would (1) reconsider my provisional ruling (a ruling which, as I explain below, was at odds with the position of the Calhouns and with the position of Yamaha) on the question of remedies and (2) rule on the question whether the Calhouns' claims are substantively rooted in federal maritime law or state law. Further, I expressed agreement with the joint view of the parties that my rulings on these two questions (whatever those rulings turned out to be) should be certified to the Court of Appeals pursuant to 28 U.S.C. § 1292(b).

### i.

My provisional decision on the question of the applicability of Pennsylvania's or Puerto Rico's remedial regime commenced with a ruling that the question was not one to be decided, *Klaxon*-wise, by reference to which jurisdiction's remedial provisions would be applied by a Pennsylvania Court of Common Pleas invoking principles of Pennsylvania conflict of laws. Because this case is deemed an admiralty case, not a diversity case, the question of whose remedial regime should be applied was, in my view, a question of federal choice-of-law law, not of state choice-of-law law. It seemed to me that for this court to be guided by how a Pennsylvania tort case involving (a) cognate claims and (b) parties of similarly diverse citizenship would be handled by a Pennsylvania Court of Common Pleas would be an invitation to a species of disuniformity in the management of maritime death claims that the Supreme Court and the Court of Appeals could hardly have intended, since it would mean that, if a case identical to this were brought in a federal district court in Puerto Rico, the question of what remedies were available would depend on Puerto Rico's choice-of-law rules which might well not be harmonious with Pennsylvania's choice-of-law rules.

In sum, I decided that whether Puerto Rico's or Pennsylvania's remedial rules should govern was a matter of federal choice of law which it was up to me to determine.

---

1. The term "state law" is here used to denote the law of Puerto Rico as well as the law of Pennsylvania, notwithstanding that Puerto Rico is, as a matter of formal federal terminology, a "commonwealth" rather than a "state." (Pennsylvania's formal self-description as the "Commonwealth of Pennsylvania," in the Preamble of the Pennsylvania Constitution, is deeply rooted in Pennsylvania's history, but it is, of course, a matter of local terminology which in no respect modifies or qualifies Pennsylvania's status as a "state" for all federal purposes.)

■ With respect to the Calhouns' claim for punitive damages, I concluded that such a claim was not cognizable in this case because Puerto Rico does not have punitive damages as part of its conventional damages arsenal. Punitive damages, I noted (Transcript, Sept. 23, 1998, pp. 35–39), are:

> intended to punish an egregious wrongdoer [and] are also intended to deter that wrongdoer and others from engaging in the grievously tortious conduct that is at issue. These two purposes appear to me to be the community purposes of the state or community in which the tortious activity takes place. The fact that Puerto Rico does not have a regime of punitive damages reflects a community determination that Puerto Rico for its reasons does not think that punitive damages are the instrument . . . through which it wishes to pursue . . . punishment on the one hand and deterrence on the other. . . .

In reaching this result I rejected the contention of the Calhouns' counsel that the Puerto Rico situs of Natalie Calhoun's death was "adventitious," and hence should be disregarded for choice-of-law purposes—"adventitious" in the sense that, in *Scott v. Eastern Air Lines, Inc.*, 399 F.2d 14, 28 (3d Cir.1967), the fact that the airplane crash in which Pennsylvania domiciliary Thomas L. Moody lost his life occurred in Boston Harbor was deemed by the en banc Third Circuit to be "adventitious" and hence not to be given choice-of-law weight. "Puerto Rico in our case," I said, "was not a place of happenstance, it was a place to which Natalie Calhoun and her [friend] and [her] friend's parents had gone for a number of days of holiday. If there was tortious activity on the part of the defendants, that activity reached its consummation in Puerto Rico at the time of Natalie Calhoun's very tragic demise." Transcript, Sept. 23, 1998, pp. 39–40.

■ Having determined that Puerto Rico's interest should govern on the question of punitive damages, I came to a contrary view on the question of compensatory damages (Transcript, Sept. 23, 1998, p. 41):

> It is Pennsylvania that must care for the Calhoun family in their loss and must afford what compensation is appropriate for the estate of Natalie Calhoun. These are matters of much more limited concern to Puerto Rico.

Subsequent to my provisional ruling the parties have rebriefed the question. But the rebriefing has not materially altered the terms of debate.[2] I adhere to the view

---

2. (A) Yamaha relies on *Lauritzen v. Larsen,* 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953), as strengthening its argument that the remedial law of Puerto Rico should govern not only as to punitive damages but also as to compensatory damages. But the case at bar is a far cry from *Lauritzen v. Larsen,* which determined that Danish law, rather than the Jones Act, should govern the liability of the Danish owner of a ship of Danish registry to a Danish crew member injured in the harbor of Havana. Larsen, the plaintiff, signed the ship's articles in New York where he subsequently brought suit; the ship's articles stipulated that Danish law governed the crew members' rights.

(B) Equally remote is *LaPlante v. American Honda Motor Co., Inc.,* 27 F.3d 731 (1st Cir. 1994), relied upon by the Calhouns to bolster their contention that all aspects of damages should be governed by Pennsylvania law. In *LaPlante,* a diversity case, the First Circuit concluded that a Rhode Island court would have applied Rhode Island's pain-and-suffering regime, rather than the less generous Colorado pain-and-suffering regime, in a catastrophic personal injury action arising out of an accident on a Honda "all-terrain vehicle"—more commonly known as an ATV—that befell a Rhode Island domiciliary in Colorado. That aspect of *LaPlante* is, of course, consonant with the Calhouns' view—in which I concur—that Pennsylvania's compensatory rules should govern the Calhouns' claims. However, when one examines the other aspects of *LaPlante* that the Calhouns rely on, there turns out to be, from the Calhouns' perspective, rather less in *LaPlante* than meets the eye:

The Calhouns argue that *LaPlante* supports their contention that Pennsylvania's punitive damages provisions should apply to the claims they are pressing in the case at bar. Although it is true that in *LaPlante* the district

that the Calhouns, at the trial of their suit against Yamaha, may not seek punitive damages but may assert whatever claims for compensatory damages are available under Pennsylvania's law of remedies to plaintiffs in wrongful death and survival actions.

ii.

The foregoing determination of which jurisdiction's rules govern which items of damages addresses the first of the two problems identified by the Supreme Court in the final footnote of its *Yamaha* opinion. Next to be addressed is the second of the two problems: determining "the source— federal or state—of the standards governing liability, as distinguished from the rules on remedies." 516 U.S. at 216 n. 14, 116 S.Ct. 619. In identifying this problem, the Court noted that it was "reserv[ing] for another day reconciliation of the maritime personal injury decisions that rejected state substantive liability standards, and the maritime wrongful-death cases in which state law has held sway." *Id.* The Court cited *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 628, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959) and *Pope & Talbot, Inc. v. Hawn*, 346 U.S. 406, 409, 74 S.Ct. 202, 98 L.Ed. 143 (1953) as prototypes of the personal injury/rejection-of-state-law jurisprudence and *Hess v. United States*, 361 U.S. 314, 319, 80 S.Ct. 341, 4 L.Ed.2d 305 (1960) and *The Tungus v.*

*Skovgaard*, 358 U.S. 588, 592–594, 79 S.Ct. 503, 3 L.Ed.2d 524(1959) as prototypes of the wrongful death/adoption-of-state-law-jurisprudence.

■ For the purpose of deciding the issue now presented to this court, what must be considered is whether the Supreme Court has jettisoned the rule which in 1960, in its *per curiam* opinion in *Goett v. Union Carbide Corp.*, 361 U.S. 340, 80 S.Ct. 357, 4 L.Ed.2d 341 (1960), the Court characterized as the holding in *The Tungus, supra*, decided less than a year before. According to *Goett, The Tungus* held that it is "a question of state law as to what is the proper substantive law to be applied in maritime torts within the territorial jurisdictions of the States in wrongful death cases." *Goett*, 361 U.S. at 342, 80 S.Ct. 357. The cursory opinion in *Hess v. United States, supra*, decided on the same day as *Goett*, was in accord.

As a conceptual matter, a determination that *The Tungus, Goett* and *Hess* are no longer good law—and, accordingly, that federal law defines the substantive rights of a claimant seeking redress for a death occurring in territorial waters—would appear to accomplish the reconciliation of personal injury and wrongful death cases adverted to by the Supreme Court in *Yamaha* as a doctrinal goal the Court looks forward to achieving at some future time.[3]

court followed Rhode Island law, not Colorado law, on punitive damages, the precise ruling of the district court, which the First Circuit sustained, was that the plaintiff had failed as a matter of law to establish a cognizable punitive damages claim; whether there was dispute as to the applicability, under Rhode Island choice-of-law law, of the Rhode Island punitive damages regime does not appear.
Finally, the Calhouns point to *LaPlante*'s statement that "the tortious conduct allegedly giving rise to plaintiff's injuries occurred in Japan, where the subject ATV was designed and its warnings devised," 27 F.3d at 741, in support of their argument that, in considering the availability of punitive damages, no weight should attach to the fact that Natalie Calhoun's fatal accident took place in Puerto Rico. One could, of course, fashion an argument that in some conceptual sense Yamaha's

allegedly tortious conduct had its situs in Japan, or perhaps in Japan and California, but to say this would not appear to strengthen the Calhouns' contention that *Pennsylvania*'s punitive damages regime should be preferred to *Puerto Rico*'s lack of such a regime. The instructions of the Court of Appeals and the Supreme Court contemplate that this court is to look specifically to the remedial law of Pennsylvania and that of Puerto Rico in fashioning the applicable legal framework.

3. *Yamaha* is not the first occasion on which the Court has noted the tension between the doctrines applicable in personal injury and wrongful death cases arising in territorial waters. See *Moragne v. States Marine Lines*, 398 U.S. at 395, 90 S.Ct. 1772. Cf., *The Tungus, supra*, 358 U.S. at 598, 79 S.Ct. 503 (opinion of Brennan, J., concurring and dissenting).

Moreover, such a determination would, on a verbal level, harmonize with the Court's ruling in *Moragne,* a case arising in the territorial waters of Florida which came to the Court ten years after *Goett* and *Hess,* and eleven years after *The Tungus,* "that an action does lie under general maritime law for death caused by violation of maritime duties." 398 U.S. at 409, 90 S.Ct. 1772.[4]

In *Moragne*—decided in 1970—the Court recognized that a judge-made federal cause of action for wrongful death was required in order to provide equitable treatment for claimants in admiralty whose decedents had lost their lives within territorial waters, rather than on the high seas, and who were not adequately protected by the federal statutes covering those engaged in maritime occupations, or by state wrongful death statutes.[5] To reach that proper conclusion, the Court expressly overturned *The Harrisburg,* 119 U.S. 199, 7 S.Ct. 140, 30 L.Ed. 358 (1886), which had held that, in the absence of a statute establishing a cause of action for wrongful death, no such claim was cognizable in admiralty. *The Harrisburg* was an incubus that shadowed the law of admiralty for almost a century until it was repudiated by *Moragne* in 1970. *The Tungus*

rests squarely on *The Harrisburg.* See *The Tungus,* 358 U.S. at 590–592, 79 S.Ct. 503. And so the question arises whether the demise of *The Harrisburg,* decreed in *Moragne,* necessarily entailed the demise of *The Tungus* (and its pallid twin offspring, *Goett* and *Hess* ) as well.

Respected authority—the 1975 edition of the classic admiralty treatise written by Charles Black and the late Grant Gilmore—has answered the question in the affirmative: *Moragne* "overruled both The Harrisburg and The Tungus (and its sequels) ...." *Grant Gilmore and Charles L. Black, Jr., The Law of Admiralty* (2d ed., 1975) 367.[6]

However, in this fortieth anniversary year of *The Tungus,* it now appears that reports of the demise of *The Tungus* and its progeny have been exaggerated. "In the wake of *Calhoun [v. Yamaha],*" maritime lawyer Walter Johnson has written, "*The Tungus, Hess* and *Goett* have taken on new life." Walter Johnson, *Diving into the Wreck; An Exploration of Yamaha Motor Corp. v. Calhoun,* 9 U.S.F. Mar. L.J. 141, 157 (1996). Mr. Johnson builds his case for this doctrinal resurrection on the Supreme Court's *Yamaha* opinion, but the evidence Mr. Johnson relies on is somewhat ambiguous.[7] More compelling

4. Although "the Court's driving concern in *Moragne* " was to "achieve[ ] uniform access by seafarers to the unseaworthiness doctrine," *Yamaha,* 516 U.S. at 213 n. 10, 116 S.Ct. 619, the Court in *Yamaha* noted that "[l]ower courts have held that *Moragne 's* wrongful death action extends to nonseafarers," *id.* at 210 n. 7, 116 S.Ct. 619, and "[w]e assume, for purposes of this decision, the correctness of that position. Similarly, as in prior encounters, we assume without deciding that *Moragne* also provides a survival action." *Id.* This court is bound by those assumptions as law of the case.

5. As pointed out in footnote 4, *supra,* the Supreme Court in *Yamaha* assumed, without deciding, that *Moragne 's* recognition of a wrongful death cause of action would also involve recognition of a survival action.

6. It is fair to say that *The Tungus, Hess* and *Goett* are not decisions admired by Professors Gilmore and Black. The 1975 edition of the

treatise, after describing the elaborate and arcane divisions of the Court in *The Tungus* (five-to-four) and *Hess* (six-to-three), says of *Goett* (five-to-three-to-one): "The Goett case, decided the same day as Hess, marked a descent into a still lower circle of the Court's private jurisprudential hell." *Gilmore and Black, supra,* at 367.

The 1975 edition of *Gilmore and Black* was the second edition. The first edition was published in 1957. Lamentably, there has been no third edition.

7. Citing footnote 10 of the Supreme Court's *Yamaha* opinion, Mr. Johnson notes that, "[s]ignificantly, the *Calhoun* Court points out that *Moragne* could have overturned *The Tungus* but did not." Johnson, *supra,* at 157. But Mr. Johnson may have over-read the *Yamaha* footnote. What the first sentence of the footnote says, in commencing a discussion of the sweep of *Moragne,* is this: "The Court might have simply overruled *The Tungus* ...

evidence is to be found in the Court of Appeals's *Yamaha* opinion. That court's opinion describes *The Tungus* as deciding that "pre-*Moragne* rights of non-seaman killed in state territorial waters depend on state wrongful death statute." 40 F.3d at 641. In a footnote, the opinion goes on to observe: "This aspect of the holding of *The Tungus* retains vitality post-*Moragne*, for the *Moragne* Court 'concluded that the primary source of the confusion [in the law of maritime wrongful deaths] is not to be found in *The Tungus*, but in *The Harrisburg*,' *Moragne*, 398 U.S. at 378, 90 S.Ct. 1772 ... only the latter of which *Moragne* accordingly overruled. *Id.* at 409, 90 S.Ct. 1772." 40 F.3d at 641 n. 39.

I conclude, therefore, that, certainly in this circuit, *The Tungus*, with all its *Harrisburg*-era warts, remains good law with respect to the proposition that "rights of non-seaman killed in state territorial waters depend on state wrongful death statute." The substantive rights of those suing derivatively from, or in the name of, nonseafarers killed in the territorial waters of a state have their source in state law, not federal law. This conclusion is mandated by the opinion of the Court of Appeals which—in conjunction with the *Yamaha* opinion of the Supreme Court—governs this case. This conclusion also appears to be in harmony with the general receptivity to state law which infuses *Yamaha* at both levels of the appellate process—in correction of my prior analysis.

The last question to be resolved is whether the state substantive law to be looked to is that of Pennsylvania or Puerto Rico. The answer to this is provided by *The Tungus* which quotes (358 U.S. at 591, 79 S.Ct. 503) from the Supreme Court's opinion in *Western Fuel Co. v. Garcia,* 257 U.S. 233, 242, 42 S.Ct. 89, 66 L.Ed. 210 (1921) as follows: "where death ... results from a maritime tort committed on navigable waters within a State whose statutes give a right of action on account of death by wrongful act, the admiralty courts will entertain a libel *in personam* for the damages sustained by those to whom such right is given." Since Puerto Rico is the jurisdiction "on [whose] navigable waters" Natalie Calhoun met her tragic death, it is the substantive law of Puerto Rico which is the source of the rights of Natalie's parents, Lucien and Robin Calhoun.

### Conclusion

In the order accompanying this opinion, this court directs that:

(1) with respect to the remedies that plaintiffs may seek, (a) partial summary judgment is granted to Yamaha,[8] insofar as Yamaha has moved to preclude plaintiffs from seeking punitive damages against Yamaha, and (b) partial summary judgment is denied to Yamaha insofar as Yamaha has moved to preclude plaintiffs from seeking compensatory damages as authorized by Pennsylvania law rather than as authorized by Puerto Rico law, plaintiffs being entitled to sue for whatever compensatory damages the Pennsylva-

---

thus permitting plaintiffs to rely on federal liability standards to obtain state wrongful-death remedies," 516 U.S. at 213 n. 10, 116 S.Ct. 619. This language does not have to be read as signifying that *Moragne* did not overrule *The Tungus*. It may also be read as signifying that the *Moragne* Court could have "simply overruled *The Tungus*" and left *The Harrisburg* (referred to in the *Moragne* text at footnote 10) in force. The three sentences of footnote 10 which follow the initial sentence, quoted above, explain why "training *Moragne* solely on *The Tungus*" would not have accomplished everything the *Moragne* Court had in mind.

Mr. Johnson also observes that "[t]he [*Yamaha*] Court notes that *Moragne* left in place the cause of action for negligence under Florida law." Johnson, *supra* at 157. The *Yamaha* Court did indeed so note, 516 U.S. at 214, 116 S.Ct. 619. But whether the *Moragne* Court could have addressed the viability of the negligence claim, given the procedural posture of the case (see *Moragne*, 398 U.S. at 376–377, 378 n. 1, 90 S.Ct. 1772), may well be matter for debate.

**8.** As noted at the beginning of this opinion, the term "Yamaha" denotes both defendants.

nia law of remedies authorizes in wrongful death actions;[9]

(2) plaintiffs' substantive liability claims have their source in the law of Puerto Rico governing wrongful death actions;

(3) given that, in this court's view, there is "substantial ground for difference of opinion" as to the legal principles underlying the foregoing two numbered paragraphs, and because, in this court's view, "an immediate appeal from the order" embodying the foregoing determinations "may materially advance the ultimate termination of the litigation," 28 U.S.C. § 1292(b), this court concludes that it would be proper to recommend to the Court of Appeals that it exercise its discretion to review these two interlocutory determinations. Specifically, this court, pursuant to 28 U.S.C. § 1292(b), certifies to the Court of Appeals the following questions:

Natalie Calhoun, the twelve-year old daughter of Lucien and Robin Calhoun, who are Pennsylvania residents, was killed when the "Wavejammer" jet ski she had rented, while on a vacation trip to Puerto Rico with a friend and her friend's parents, crashed into a vessel anchored in territorial waters just off shore. Natalie's parents brought suit against Yamaha Motor Corporation, a Japanese corporation which is the manufacturer of Wavejammer jet skis, and Yamaha Motor Co., Ltd., a California corporation which is the American distributor of Wavejammers (the defendants are hereinafter collectively referred to as "Yamaha"), in a federal district court in Pennsylvania. The complaint, which alleges defects in the Wavejammer Natalie Calhoun rented, sounds in negligence, strict liability, and implied warranties of merchantability and fitness. The Court of Appeals for the Third Circuit, 40 F.3d 622 and the Supreme Court, 516 U.S. 199, 116 S.Ct.

619, 133 L.Ed.2d 578, have concluded that the Calhouns' suit against Yamaha, arising out of their daughter's tragic death, is an admiralty suit arising under the aegis of *Moragne v. States Marine Lines,* 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970). Further, in considering what sorts of damages the Calhouns may sue for, the two appellate courts have concluded that the question of what damages may be sought under this *Moragne* cause of action is a matter of state law. But the two appellate courts did not themselves undertake to decide what state's law would govern: That question—involving a choice between the remedial law of Pennsylvania and that of Puerto Rico—was to be addressed, in the first instance, by this court on remand. Similarly, the two appellate courts reserved decision on what state's substantive liability law was the source of the Calhoun's suit. The questions now posed are these:

1. Did this court err in deciding, on remand, that partial summary judgment should be granted to Yamaha, precluding any claim by the Calhouns for punitive damages, on the ground that (a) the availability of punitive damages should be determined by the remedial law of Puerto Rico, the situs of the tragic accident giving rise to the suit, and (b) the law of remedies of Puerto Rico makes no provision for punitive damages?

2. Did this court err in deciding, on remand, that the Calhouns' entitlement to seek particular categories of compensatory damages should be determined by the law of remedies of Pennsylvania, the state of residence of Lucien and Robin Calhoun and of their daughter Natalie, rather than by the law of remedies of Puerto Rico, the situs of Natalie's fatal accident, and hence that Yamaha's motion for partial summary judgment should be denied insofar as it sought to

---

**9.** The term "wrongful death actions" is to be understood as including survival actions. See note 5, *supra.*

preclude the Calhouns from seeking compensatory damages in conformity with the law of remedies of Pennsylvania?

3. Did this court err in deciding, on remand, that the jurisdiction whose substantive liability law is the source of the Calhouns' claims is Puerto Rico?

## ORDER

For the reasons set forth in the accompanying opinion, it is hereby ordered that:

(1) with respect to the remedies that plaintiffs may seek, (a) partial summary judgment is GRANTED to defendants (hereinafter, "Yamaha") insofar as Yamaha has moved to preclude plaintiffs from seeking punitive damages against Yamaha, and (b) partial summary judgment is DENIED to Yamaha insofar as Yamaha has moved to preclude plaintiffs from seeking compensatory damages as authorized by Pennsylvania law rather than as authorized by Puerto Rico law, plaintiffs being entitled to sue for whatever compensatory damages the Pennsylvania law of remedies authorizes in wrongful death actions (the term "wrongful death actions" is to be understood as including survival actions);

(2) plaintiffs' substantive liability claims have their source in the law of Puerto Rico governing wrongful death actions;

(3) given that, in this court's view, there is "substantial ground for difference of opinion" as to the legal principles underlying the foregoing two numbered paragraphs, and because, in this court's view, "an immediate appeal from the order" embodying the foregoing determinations "may materially advance the ultimate termination of the litigation," 28 U.S.C. § 1292(b), this court concludes that it would be proper to recommend to the Court of Appeals that it exercise its discretion to review these two interlocutory determinations. Specifically, this court, pursuant to 28 U.S.C. § 1292(b), certifies to the Court of Appeals the following questions:

Natalie Calhoun, the twelve-year old daughter of Lucien and Robin Calhoun, who are Pennsylvania residents, was killed when the "Wavejammer" jet ski she had rented, while on a vacation trip to Puerto Rico with a friend and her friend's parents, crashed into a vessel anchored in territorial waters just off shore. Natalie's parents brought suit against Yamaha Motor Corporation, a Japanese corporation which is the manufacturer of Wavejammer jet skis, and Yamaha Motor Co., Ltd., a California corporation which is the American distributor of Wavejammers (the defendants are hereinafter collectively referred to as "Yamaha"), in a federal district court in Pennsylvania. The complaint, which alleges defects in the Wavejammer Natalie Calhoun rented, sounds in negligence, strict liability, and implied warranties of merchantability and fitness. The Court of Appeals for the Third Circuit, 40 F.3d 622 and the Supreme Court, 516 U.S. 199, 116 S.Ct. 619, 133 L.Ed.2d 578, have concluded that the Calhouns' suit against Yamaha, arising out of their daughter's tragic death, is an admiralty suit arising under the aegis of *Moragne v. States Marine Lines*, 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970). Further, in considering what sorts of damages the Calhouns may sue for, the two appellate courts have concluded that the question of what damages may be sought under this *Moragne* cause of action is a matter of state law. But the two appellate courts did not themselves undertake to decide what state's law would govern: That question—involving a choice between the remedial law of Pennsylvania and that of Puerto Rico—was to be addressed, in the first instance, by this court on remand. Similarly, the two appellate courts reserved decision on what state's substantive liability law was the source of the Calhoun's suit. The questions now posed are these:

1. Did this court err in deciding, on remand, that partial summary judgment

298

should be granted to Yamaha, precluding any claim by the Calhouns for punitive damages, on the ground that (a) the availability of punitive damages should be determined by the remedial law of Puerto Rico, the situs of the tragic accident giving rise to the suit, and (b) the law of remedies of Puerto Rico makes no provision for punitive damages?

2. Did this court err in deciding, on remand, that the Calhouns' entitlement to seek particular categories of compensatory damages should be determined by the law of remedies of Pennsylvania, the state of residence of Lucien and Robin Calhoun and of their daughter Natalie, rather than by the law of remedies of Puerto Rico, the situs of Natalie's fatal accident, and hence that Yamaha's motion for partial summary judgment should be denied insofar as it sought to preclude the Calhouns from seeking compensatory damages in conformity with the law of remedies of Pennsylvania?

3. Did this court err in deciding, on remand, that the jurisdiction whose substantive liability law is the source of the Calhouns' claims is Puerto Rico?