Present:  All the Justices

JOHN CRANE, INC.

v.  Record No. 101909     OPINION BY JUSTICE DONALD W. LEMONS
                                        March 2, 2012
MARGARET DIANE HARDICK, EXECUTOR OF
THE ESTATE OF ROBERT EUGENE HARDICK,
DECEASED, ET AL.

FROM THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS
Aundria D. Foster, Judge

Among the several issues we address in this appeal is whether the Circuit Court of the City of Newport News ("trial court") erred when it permitted the jury to award nonpecuniary damages in a wrongful death action of a Navy sailor for asbestos exposure that occurred both in territorial waters and on the high seas.

I. Facts and Proceedings Below

Robert Eugene Hardick ("Hardick") filed suit under general maritime law against John Crane, Inc. ("JCI") and 22 other defendants seeking $20 million in compensatory damages and $5 million in punitive damages.  Hardick's complaint alleged that he was exposed to asbestos dust, fibers, and particles contained in products manufactured by JCI, and he contracted mesothelioma as a result of such exposure.  Hardick died prior to trial, and his action was revived as a wrongful death action by his wife, Margaret D. Hardick ("Mrs. Hardick"), in her capacity as executor of his estate.  Mrs. Hardick settled or

nonsuited the claims against all defendants except JCI and proceeded against JCI, the sole remaining defendant.

Prior to trial, JCI filed a motion in limine to exclude evidence of nonpecuniary damages. JCI argued that "[Mrs. Hardick's] own theory of liability depend[ed] upon [Hardick having] significant exposure to asbestos while onboard Navy ships underway on the high seas and in foreign ports," and Mrs. Hardick is only entitled to recover damages available under the Death on the High Seas Act ("DOHSA"), 46 U.S.C. §§ 30301, et seq. (2006 & Supp. III 2010). JCI further argued that because DOHSA "precludes recovery of nonpecuniary damages such as pain and suffering, loss of society/consortium, or punitive damages, . . . and in furtherance of the Constitution's requirement of uniformity in application of federal maritime law, any recovery by [Mrs. Hardick] under the general maritime law is likewise limited to pecuniary damages." Additionally, JCI argued that Hardick was a seaman as defined by the United States Supreme Court ("Supreme Court") in McDermott Int'l, Inc. v. Wilander, 498 U.S. 337, 355-56 (1991).

In response, Mrs. Hardick claimed that she was the master of her pleadings, and could pursue recovery either under DOHSA for injuries sustained on the high seas or under general maritime law for injuries sustained in territorial waters. Mrs. Hardick elected to pursue recovery under general maritime

2

law for Hardick's asbestos exposure.  Moreover, Mrs. Hardick argued that Hardick was not a seaman, but rather a "nonseafarer" as defined by the Supreme Court in Yamaha Motor Corp. v. Calhoun, 516 U.S. 199, 205 n.2 (1996).  The trial court denied JCI's motion to exclude evidence of nonpecuniary damages, stating that its ruling was based on "the reasons stated by [Mrs. Hardick]."

JCI also filed a motion in limine to exclude Mrs. Hardick's evidence of the removal of asbestos-containing gaskets, arguing that Hardick's deposition testimony[1] and the deposition testimony of Hardick's former co-workers failed to establish that Hardick ever removed gaskets manufactured by JCI.  At a pre-trial hearing, the parties informed the trial court that various motions had been resolved, including the motion to exclude evidence of asbestos exposure resulting from the removal of gaskets.  Mrs. Hardick represented that JCI's motion relating to the removal of asbestos-containing gaskets had been "dropped."  JCI agreed and withdrew its motion, declaring "it's a jury issue."  However, JCI retained the right to move to strike such evidence at the close of Mrs. Hardick's case if the evidence was insufficient to establish that Hardick removed asbestos-containing gaskets manufactured by JCI.

---

[1] Because Hardick died prior to trial, his deposition testimony was presented by video.

Prior to trial, Mrs. Hardick filed a motion in limine requesting that the trial court prohibit JCI's "Navy expert," Wesley Hewitt ("Hewitt"), from "giving speculative and misleading testimony" regarding the types and amounts of insulation to which Hardick may have been exposed. The trial court granted Mrs. Hardick's motion regarding Hewitt; however, the trial court stated that "[t]he parties agree that Hewitt may testify on the basis of documents that he has reviewed and produced about other products to which Mr. Hardick may have been exposed provided that [JCI] ties such exposure directly to Mr. Hardick."

Mrs. Hardick presented the following evidence at trial. Hardick served in the United States Navy from 1957 to 1976 on several different vessels, both in domestic ports and in foreign ports. Hardick testified that one vessel he serviced was seldom in port; and, consequently, his duties were often performed at sea.

From 1958 to 1962, Hardick worked as a shipfitter and reported for duty upon the USS Newport News, the USS Tutuila, and the USS Wrangell. As a shipfitter, Hardick repaired and replaced valves and gaskets. The valves and gaskets Hardick repaired contained asbestos.

Hardick testified that during his time on board the USS Newport News, he recalled one journey to Guantanamo Bay, Cuba,

during which he performed his routine duties as a shipfitter. While Hardick was on board the USS Wrangell, the vessel sailed on a 13-month voyage to the Mediterranean and from the Mediterranean, to Cuba. Hardick performed his duties during these voyages while on the high seas.

James Croom, Jr. ("Croom"), Hardick's supervisor on the USS Tutuila, testified that the USS Tutuila was stationed in Norfolk, Virginia, and the vessel "usually stayed tied up at Pier 2." Because the USS Tutuila was docked in Norfolk, Hardick's performed his duties as a shipfitter in territorial waters.

After attending school to become a machinery repairman, Hardick worked as a machine repairman aboard the USS Everglades, the USS Bordelon, and the USS Detroit from 1963 to 1971. As a machinery repairman, Hardick's tasks primarily involved repairing valves, but he still occasionally worked on the piping systems aboard the vessels.

Hardick testified that he recalled traveling to the Mediterranean once while on board the USS Everglades. However, the USS Everglades was based and primarily stayed in Charleston, South Carolina during Hardick's service on the vessel. In particular, Hardick testified that "[w]e stayed mostly in Charleston tied up working on destroyers."

5

During his tenure on the USS Bordelon, Hardick repaired an entire diesel generator while the vessel was at sea.  Hardick testified that he was next assigned to the USS Detroit, which was located at the naval shipyard in Bremerton, Washington, because the vessel was in the process of being built.  After the USS Detroit was commissioned, Hardick continued to service the vessel as a machinery repairman.

From 1971 to 1976, Hardick served as the master of arms aboard the USS Yellowstone and later as a race-relations specialist aboard the USS Canopus.  In these capacities, Hardick continued to work around people using the same products that he worked with as a shipfitter and a machinery repairman, namely, valves and gaskets.  Specifically, Hardick testified that he was exposed to asbestos dust on board the USS Canopus when the vessel was underway to Guantanamo Bay, Cuba.

Hardick testified that he worked with gaskets manufactured by JCI and Garlock, and could not tell the difference between JCI packing materials and Garlock packing materials that were not in the original box or package because "[t]hey looked identical."  Hardick's co-worker, Frank Hoople, testified that he was unable to identify who manufactured the gasket materials that he removed.  Moreover, Croom testified that Hardick regularly used both JCI and Garlock gaskets and packing materials while working on the USS Tutuila.  When asked whether

6

Hardick was exposed to gaskets manufactured by companies other than JCI and Garlock, Croom testified "I'm sure there w[ere] a lot of others," but he could not remember the names of specific manufacturers.

In February 2007, Hardick was diagnosed with mesothelioma, a fatal form of cancer, and he died in March 2009. Mrs. Hardick's expert testified that Hardick's mesothelioma was the result of his "cumulative asbestos exposures" during his approximately twenty-year service in the Navy and that mesothelioma is an "indivisible disease."

At the close of Mrs. Hardick's case, JCI renewed its objection to Mrs. Hardick's claim for nonpecuniary damages. The trial court adhered to its pre-trial ruling. JCI also moved to strike the portions of Mrs. Hardick's evidence that Hardick's asbestos exposure resulted from gasket removal because no direct evidence was presented at trial that Hardick ever removed gaskets manufactured by JCI. The trial court denied the motion, concluding that there was sufficient circumstantial evidence that Hardick removed gaskets manufactured by JCI, and the jury should decide the issue.

JCI subsequently attempted to call Hewitt as a witness and represented that he would testify on various issues related to the United States Navy. However, Mrs. Hardick objected to Hewitt's testimony based, in part, upon JCI's stipulation that

Hewitt would "not opine about Hardick's exposure to asbestos, a subject that more appropriately falls within other expert[s'] fields."  (Emphasis in original.)  Also, Mrs. Hardick argued that Hewitt admitted at his pre-trial deposition testimony that he could not testify about any specific repairs or job on any of Hardick's ships, and that he had no personal knowledge concerning any specific environment in which Hardick worked. Granting Mrs. Hardick's motion, the trial court ruled that because JCI "can't connect [any of Hewitt's proposed testimony] up directly to Mr. Hardick, then it's not appropriate.  It's irrelevant."

Following the presentation of all the evidence, JCI renewed its motions to strike Mrs. Hardick's evidence of nonpecuniary damages and gasket removal.  The trial court denied JCI's motions, reaffirming its previous rulings.

Although JCI was the sole defendant at trial, JCI presented evidence that Hardick was exposed to asbestos contained in valves that had been manufactured by Crane Company[2] and gaskets that had been manufactured by Garlock.  Crane Company and Garlock are two of the manufacturers that settled

---

[2] Crane Company is a Virginia corporation and is the "parent and/or successor in interest to Crane Environmental, Inc., Crane Valve Group and Pacific Valves, Inc."; whereas, JCI is a Delaware corporation.  The record does not reveal the connection, if any, between Crane Company and JCI.

with Mrs. Hardick prior to trial.  Mrs. Hardick and JCI agreed to a jury instruction that permitted the jury to apportion damages among JCI, Garlock, and Crane Company, which was given by the trial court.

The jury returned a verdict for Mrs. Hardick in the amount of $5,977,482, apportioning 50 percent of the fault to JCI and 50 percent to Garlock.  The verdict included $2 million for Hardick's pain and suffering; $1.15 million for Mrs. Hardick's loss of society; $2.5 million for Mrs. Hardick's reasonably expected loss of Hardick's income and loss of Hardick's services; $319,650 for Hardick's medical expenses; and $7,832 for Hardick's funeral expenses.[3]

Thereafter, JCI filed its motion for new trial, renewing its objection to: (1) the trial court's admission of Mrs. Hardick's evidence of gasket removal and (2) the trial court's "exclusion of circumstantial evidence proffered by JCI regarding Hardick's potential exposure to various other types of brands of gasket and packing material."  JCI also filed a motion for partial judgment or, alternatively, for remittitur, arguing that the nonpecuniary portion of the verdict should be vacated.  The trial court denied both motions and entered final

---

[3] The awards for loss of income and loss of services and for medical and funeral expenses are not the subject of an assignment of error and are, therefore, not at issue in this appeal.

judgment requiring JCI to pay 50 percent of the damages awarded by the jury to Mrs. Hardick, a sum of $2,988,741.

JCI timely filed its petition for appeal, and we granted JCI's appeal on the following assignments of error:

1. The trial court committed reversible error by allowing the jury to award nonpecuniary damages for the wrongful death of a Navy sailor, who alleged an "indivisible" injury from exposure to asbestos that occurred, in part, on the high seas.

2. The trial court committed reversible error in allowing plaintiff to introduce evidence of asbestos exposure from gasket removal, where plaintiff did not prove that any gasket removed was more likely than not a gasket supplied by JCI. The trial court compounded that error by precluding JCI from introducing circumstantial evidence of Hardick's exposures to asbestos-containing products supplied by other entities.

## II. Analysis

### A. Standard of Review

The first assignment of error presents "a mixed question of law and fact," which we review de novo. Westgate at Williamsburg Condo. Ass'n v. Philip Richardson Co., 270 Va. 566, 574, 621 S.E.2d 114, 118 (2005).

The second assignment of error involves the admissibility of evidence. It is well-settled that we "review a trial court's decision to exclude evidence for an abuse of discretion, and we will not disturb a trial court's evidentiary ruling absent an abuse of discretion." Kimble v. Carey, 279 Va. 652, 662, 691 S.E.2d 790, 796 (2010). Furthermore, "[a]

10

great deal must necessarily be left to the discretion of the [trial court], in determining whether evidence is relevant to the issue or not.  Evidence is relevant if it has any logical tendency to prove an issue in a case." Avent v. Commonwealth, 279 Va. 175, 197-98, 688 S.E.2d 244, 257 (2010) (quoting John Crane, Inc. v. Jones, 274 Va. 581, 590, 650 S.E.2d 851, 855 (2007)).

## B. Nonpecuniary Damages

Prior to trial, JCI filed a motion in limine, requesting that the trial court exclude evidence of nonpecuniary damages and argued, among other things, that Hardick was a "seaman" as defined by the Supreme Court in McDermott Int'l, Inc. v. Wilander, 498 U.S. at 355 (defining "seaman," in part, as one who "contribute[s] to the function of the vessel").  JCI further argued that, as a seaman, Hardick was precluded from recovering nonpecuniary damages.  Relying upon Miles v. Apex Marine Corp., 498 U.S. 19, 31-32 (1990), JCI maintained that "there is no recovery for loss of society in a general maritime action for the wrongful death of a . . . seaman[,]" because damages recoverable under a general maritime action for the wrongful death of a seaman are limited to those that are pecuniary in nature.

To the contrary, Mrs. Hardick argued that Hardick was not a "seaman"; rather, he was a "nonseafarer" pursuant to Yamaha,

11

in which the Supreme Court defined "nonseafarer" as "persons who are neither seamen covered by the Jones Act . . . nor longshore workers covered by the Longshore and Harbor Workers' Compensation Act [("LHWCA")]." 516 U.S. at 205 n.2. Mrs. Hardick further argued that because Hardick was a nonseafarer pursuant to Yamaha, 519 U.S. at 205, 216, and because she was the master of her pleadings and her complaint was based on a general maritime wrongful death cause of action due to Hardick's asbestos exposure in territorial waters, she was not precluded from recovering nonpecuniary damages.

The trial court denied JCI's motion, stating that it was "persuaded by [Mrs. Hardick's] cases and by [her] argument and by [her] analysis." The trial court further explained that, "for the reasons stated by [Mrs. Hardick] and the authority that [she has] relied on, I'm going to overrule the motion and allow evidence for nonpecuniary damages."

In Wilander, the Supreme Court noted that the term "seaman" is "a maritime term of art" and that "this Court continue[s] to construe 'seaman' broadly."[4] 498 U.S. at 342,

_____

[4] Mrs. Hardick argues that "[u]nder Wilander, [498 U.S. at 354,] to qualify as a seaman a worker must prove that he is a 'master or member of a crew' of a merchant 'vessel.'[] Navy sailors like Mr. Hardick do not qualify for many reasons, not the least of which is that the vessels they crew are not merchant vessels." (Emphasis in original.) However, Wilander does not require that a seaman be a master or member of a crew of a "merchant" vessel. 498 U.S. at 339-57. The term

12

346.  Significantly, the Supreme Court, in defining the term "seaman," explained in <u>Wilander</u> that,

> the requirement that an employee's duties must 'contribute to the function of the vessel or to the accomplishment of its mission' captures well an important requirement of seaman status.  It is not necessary that a seaman aid in navigation or contribute to the transportation of the vessel, but a seaman must be doing the ship's work.

<u>Id.</u> at 355 (quoting <u>Offshore Co. v. Robison</u>, 266 F.2d 769, 779 (5th Cir. 1959)).[5]  The Supreme Court further explained that, "[b]y the middle of the 19th century, the leading admiralty treatise noted the wide variety of those eligible for seamen's benefits[, such as]: 'Masters, mates, sailors, surveyors, carpenters, coopers, stewards, cooks, cabin boys, kitchen boys, engineers, pilots, firemen, deck hands, [and] waiters.' "  <u>Id.</u> at 344 (quoting Erastus C. Benedict, American Admiralty § 278, at 158 (1850)).

Mrs. Hardick again argues on appeal that Hardick was not a seaman; rather, Hardick was a "nonseafarer" pursuant to <u>Yamaha</u>, because he was  "neither [a] seam[a]n covered by the Jones Act

---

"merchant" does not appear in <u>Wilander</u>.  <u>Id.</u>

[5] The Supreme Court subsequently expanded upon the definition of a seaman, stating that "a seaman must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its duration and its nature."  <u>Chandris, Inc. v. Latsis</u>, 515 U.S. 347, 368 (1995).

13

. . . nor [a] longshore worker[] covered by the [LHWCA]." 516 U.S. at 205 n.2.

Yamaha involved the death of a 12-year-old girl while riding a jet ski in the waters fronting a hotel in Puerto Rico. The Supreme Court had no trouble observing that this 12-year-old girl was "not a seaman, longshore worker, or person otherwise engaged in a maritime trade." Id. at 202. The Court held that "damages available for the jet ski death . . . are properly governed by state law." Id. at 216. Hardick's status is hardly comparable to that of a 12-year-old girl riding a jet ski. We look elsewhere for definition of his status.

Here, the evidence overwhelmingly demonstrated that: (1) Hardick was a shipfitter and a machinery repairman who "contribute[d] to the function of the vessel[s] or to the accomplishment of [their] mission[s]," Wilander, 498 U.S. at 355; and (2) had "a connection to [an identifiable group of] vessel[s] in navigation . . . that [was] substantial in terms of both its duration and its nature." Chandris, 515 U.S. at 368-69. Therefore, we hold that Hardick was a seaman as defined by the Supreme Court in Wilander, 498 U.S. at 355, and Chandris, 515 U.S. at 368-69.

JCI argues in its first assignment of error that the trial court erred "by allowing the jury to award nonpecuniary damages for the wrongful death of a Navy sailor, who alleged an

14

'indivisible' injury from exposure to asbestos that occurred, in part, on the high seas." We agree.

"[D]amages for the intangible, noneconomic aspects of mental and emotional injury are of a different nature. They are inherently nonpecuniary, unliquidated and not readily subject to precise calculation." Greater Westchester Homeowners Ass'n v. City of Los Angeles, 603 P.2d 1329, 1338 (Cal. 1979). The Supreme Court has held that damages compensating a plaintiff for the decedent's pre-death pain and suffering are nonpecuniary. Dooley v. Korean Air Lines Co., 524 U.S. 116, 118, 120 (1998) (stating that DOHSA "allows certain relatives of the decedent to sue for their pecuniary losses [and, as a result,] does not authorize recovery for the decedent's pre-death pain and suffering") (emphasis added). Additionally, the Supreme Court has held that loss of society damages are nonpecuniary. Zicherman v. Korean Air Lines Co., 516 U.S. 217, 230 (1996) (stating that, "DOHSA provides that the recovery . . . 'shall be a fair and just compensation for the pecuniary loss sustained by the persons for whose benefit the suit is brought.' Thus, petitioners cannot recover loss-of-society damages under DOHSA.") (internal citation omitted) (emphasis added). The $2 million award for Hardick's pain and suffering and the $1.15 million award for Mrs. Hardick's loss of society are nonpecuniary damages.

15

Pecuniary damages are those that "can be measured by some standard." <u>Michigan Cent. R.R. Co. v. Vreeland</u>, 227 U.S. 59, 71 (1913).  In particular, the Supreme Court has stated that damages for loss of services are a pecuniary loss.  <u>Id.</u>  Mrs. Hardick's reasonably expected loss of Hardick's income, his medical expenses, and his funeral expenses "can be measured by some standard" and, as a result, are pecuniary in nature.  <u>See</u> <u>Miles</u>, 498 U.S. at 30 (observing that pecuniary damages include damages for "losses of support, services, and funeral expenses").  Accordingly, the $2.5 million award for Mrs. Hardick's reasonably expected loss of Hardick's income and loss of Hardick's services, the $319,650 award for Hardick's medical expenses, and the $7,832 award for Hardick's funeral expenses are pecuniary damages.  In this case, the only awards of damages that are nonpecuniary and at issue in this appeal are the $2 million award for Hardick's pain and suffering and the $1.15 million award for Mrs. Hardick's loss of society.

Mrs. Hardick goes to great lengths to explain the history of the common law wrongful death cause of action and argues that a wrongful death cause of action exists under general maritime law apart from any statutory enactment and that such a cause of action existed prior to the enactment of DOHSA and the Jones Act.  Specifically, Mrs. Hardick argues that the Supreme

16

Court "issued a flawed opinion" when it decided The Harrisburg, 119 U.S. 199 (1886).

In 1877, the steamer "Harrisburg" collided with a schooner off the coast of Massachusetts in territorial waters. Id. at 199. The schooner sank, and its first officer drowned. Id. His widow subsequently brought a wrongful death action against the "Harrisburg," and the Supreme Court held, on appeal, "that admiralty afforded no remedy for wrongful death in the absence of an applicable state or federal statute." Mobil Oil Corp. v. Higginbotham, 436 U.S. 618, 620 (1978) (citing The Harrisburg, 119 U.S. at 213-14). "Thereafter, suits arising out of maritime fatalities were founded by necessity on state wrongful-death statutes." Id.

Congress subsequently enacted DOHSA in 1920,[6] creating a remedy in admiralty for wrongful deaths "[w]hen the death of an individual is caused by wrongful act, neglect, or default occurring on the high seas beyond 3 nautical miles from the shore of the United States." 46 U.S.C. § 30302. DOHSA provides that "[t]he recovery in an action under this chapter . . . shall be a fair compensation for the pecuniary loss sustained by the individuals for whose benefit the action is brought." 46 U.S.C. § 30303. Additionally, Congress passed

---

[6] See former 46 U.S.C. Appx. § 761 et seq. (2000) (superseded 2006).

17

the Jones Act that same year,[7] providing that "[a] seaman injured in the course of employment or, if the seaman dies from the injury, the personal representative of the seaman may elect to bring a civil action at law . . . against the employer."  46 U.S.C. § 30104.

For the next 50 years, "deaths on the high seas gave rise to federal suits under DOHSA, while those in territorial waters were largely governed by state wrongful-death statutes." Higginbotham, 436 U.S. at 621.  As the Supreme Court has stated, "DOHSA brought a measure of uniformity and predictability to the law on the high seas, but in territorial waters, where The Harrisburg made state law the only source of a wrongful-death remedy, the continuing impact of that decision produced uncertainty and incongruity."  Id.

In response to this uncertainty, the Supreme Court overruled The Harrisburg in 1970.  Moragne v. States Marine Lines, Inc., 398 U.S. 375, 409 (1970).  In Moragne, the Supreme Court "created a general maritime wrongful death cause of action," thereby effectuating "the constitutionally based principle that federal admiralty law should be 'a system of law coextensive with, and operating uniformly in, the whole

---

[7] See former 46 U.S.C. Appx. § 688 (2000) (superseded 2006).

18

country.' " Miles, 498 U.S. at 27; Moragne, 398 U.S. at 402, 409 (quoting The Lottawanna, 88 U.S. 558, 575 (1875)).

Mrs. Hardick argues that when the Supreme Court overruled The Harrisburg, "it returned maritime wrongful death law to its pre-Harrisburg state. And that pre-Harrisburg state . . . recognized non-pecuniary damages at least half a century before Congress . . . enacted DOHSA and the Jones Act." However, the Supreme Court based its decision to overrule The Harrisburg, in large part, upon its conclusions that the Jones Act "was intended to achieve uniformity in the exercise of admiralty jurisdiction," and DOHSA "was not intended to preclude the availability of a remedy for wrongful death under general maritime law in situations not covered by the Act." Moragne, 398 U.S. at 401-02 (internal quotation marks omitted). Moreover, while the Supreme Court "created a general maritime wrongful death cause of action" in Moragne, "Moragne did not set forth the scope of the damages recoverable under the maritime wrongful death action." Miles, 498 U.S. at 27, 30.

Four years after its decision in Moragne, the Supreme Court, in Sea-Land Servs. v. Gaudet, 414 U.S. 573 (1974), addressed "whether the widow of a longshoreman may maintain such an action for the wrongful death of her husband – alleged to have resulted from injuries suffered by him while aboard a vessel in [territorial] waters – after the decedent recovered

19

damages in his lifetime for his injuries." 414 U.S. at 574.

The accident in Gaudet, like that in Moragne, took place in territorial waters, where DOHSA did not apply. Id. See Moragne, 398 U.S. at 376. However, in Gaudet, the Supreme Court "chose not to adopt DOHSA's pecuniary-loss standard; instead it followed the 'clear majority of States' and 'the humanitarian policy of the maritime law,' both of which favored recovery for loss of society." Higginbotham, 436 U.S. at 622 (quoting Gaudet, 414 U.S. at 587-88). Therefore, the Supreme Court "made a policy determination in Gaudet which differed from the choice made by Congress when it enacted [DOHSA]."[8] Id.

Following Gaudet, the Supreme Court, in Higginbotham, addressed the issue "whether, in addition to the damages authorized by federal statute, a decedent's survivors may also recover damages under general maritime law." 436 U.S. at 618. In Higginbotham, a helicopter crashed and the decedents died on the high seas. Id. at 618-19. Significantly, the Supreme Court noted that,

_____

[8] Mrs. Hardick relies heavily upon Gaudet to support her argument that she may recover nonpecuniary damages under the facts of this case. However, as the Supreme Court subsequently stated in Miles, "[t]he holding of Gaudet applies only in territorial waters, and it applies only to longshoremen." Miles, 498 U.S. at 31. Moreover, "the 1972 amendments to LHWCA [33 U.S.C. § 905(b)] have rendered Gaudet inapplicable on its facts." Id. at 31 n.1. Consequently, Gaudet is irrelevant to the resolution of this case.

20

> [t]he Gaudet opinion was broadly written.
> It did not state that the place where death
> occurred had an influence on its analysis.
> Gaudet may be read, as it has been, to
> replace [DOHSA] entirely . . . .  Its
> holding, however, applies only to
> [territorial] waters.  We therefore must now
> decide which measure of damages to apply in
> a death action arising on the high seas --
> the rule chosen by Congress [in DOHSA] in
> 1920 or the rule chosen by this Court in
> Gaudet.

Id. at 622-23.  In considering whether Gaudet impacted the measure of damages for wrongful death actions arising on the high seas, the Supreme Court in Higginbotham reiterated the importance of uniformity in maritime law, stating that "[a]s Moragne itself implied, DOHSA should be the courts' primary guide as they refine the nonstatutory death remedy, both because of the interest in uniformity and because Congress' considered judgment has great force in its own right."  Id. at 624.

Moreover, the Supreme Court explained that, "[i]n Moragne, the Court recognized a wrongful-death remedy that supplements federal statutory remedies.  But that holding depended on our conclusion that Congress withheld a statutory remedy in [territorial] waters" in DOHSA because such claims were then controlled by state wrongful death statutes.  Id. at 625 (citing Moragne, 398 U.S. at 397-98) (emphasis added).  The Supreme Court further noted that "[t]here is a basic difference

21

between filling a gap left by Congress' silence and rewriting rules that Congress has affirmatively and specifically enacted" and, consequently, "[i]n an area covered by the statute, it would be no more appropriate to prescribe a different measure of damages than to prescribe a different statute of limitations or a different class of beneficiaries." Id.

Accordingly, in an effort to promote uniformity in the availability of damages in maritime wrongful death actions, the Supreme Court held in Higginbotham that when the decedent's death occurs on the high seas, a decedent's survivors may not supplement the damages available under DOSHA--damages for pecuniary loss--with additional damages under general maritime law for nonpecuniary losses. Id. at 620-26.

While interesting and informative, Mrs. Hardick's reliance upon the Supreme Court's admiralty jurisprudence for the proposition that a wrongful death cause of action has existed under general maritime law apart from, and prior to, any statutory enactment offers little to the resolution of this case. Mrs. Hardick makes much of the distinction between a wrongful death cause of action under DOHSA and a general maritime law wrongful death cause of action. However, for the purpose of determining what damages are available, it is irrelevant in this case whether Mrs. Hardick's claim was brought under DOHSA or under general maritime law. The Supreme

22

Court has made it clear that, based upon principles of uniformity, nonpecuniary damages are not available in "actions for the wrongful death of a seaman, whether under DOHSA, the Jones Act, or general maritime law." Miles, 498 U.S. at 32-33.[9]

In Miles, the Supreme Court addressed the issue "whether the parent of a seaman who died from injuries incurred aboard [a] vessel [in territorial waters] may recover under general maritime law for loss of society." Id. at 21. In that case, the mother of the decedent, who was also the administratrix of the deceased seaman's estate, filed a claim under general maritime law. Id. As in this case, the decedent's estate in Miles sought recovery for damages for loss of society. Id. at 21-22. The Supreme Court concluded in Miles, "that there is no recovery for loss of society in a general maritime action for the wrongful death of a Jones Act seaman." Id. at 33.

The Supreme Court explained its holding as follows:

> Unlike DOHSA, the Jones Act does not explicitly limit damages to any particular form. Enacted in 1920, the Jones Act makes applicable to seamen the substantive recovery provisions of the older [Federal Employers' Liability Act ("FELA"), 45 U.S.C. §§ 51-59 (1908)]. See 46 U. S. C. App. § 688. FELA recites only that employers shall be liable in "damages" for the injury or death of one protected under the Act.

_____

[9] Any reference to recovery of damages for pain and suffering in a wrongful death action under general maritime law contained in footnote three of John Crane, Inc. v. Jones, 274 Va. 581, 586, 650 S.E.2d 851, 853 (2007), is dicta and is inconsistent with this opinion.

45 U. S. C. § 51.  In <u>Michigan Central R.</u>
<u>Co. v. Vreeland</u>, 227 U.S. 59, 57[] (1913),
however, the Court explained that the language of
the FELA wrongful death provision is essentially
identical to that of Lord Campbell's Act, 9 & 10
Vict. ch. 93 (1846), the first wrongful death
statute.  Lord Campbell's Act also did not limit
explicitly the "damages" to be recovered, but
that Act and the many state statutes that
followed it consistently had been interpreted as
providing recovery only for pecuniary loss.
<u>Vreeland</u>, 227 U.S. at 69-71.  The Court so
construed FELA.  <u>Ibid</u>.

When Congress passed the Jones Act, [it]
must have intended to incorporate the pecuniary
limitation on damages as well.  We assume that
Congress is aware of existing law when it passes
legislation.

<u>Id.</u> at 32.  The Supreme Court further explained:

Our decision also remedies an anomaly we created
in <u>Higginbotham</u>.  Respondents in that case warned
that the elimination of loss of society damages
for wrongful deaths on the high seas would create
an unwarranted inconsistency between deaths in
territorial waters, where loss of society was
available under <u>Gaudet</u>, and deaths on the high
seas.  We recognized the value of uniformity, but
concluded that a concern for consistency could
not override the statute.  <u>Higginbotham</u>, [436
U.S. at 624].

<u>Id.</u> at 33.  Significantly, the Supreme Court concluded by

declaring: "Today we restore a <u>uniform rule applicable to all</u>

<u>actions for the wrongful death of a seaman, whether under</u>

<u>DOHSA, the Jones Act, or general maritime law</u>."  <u>Id.</u> (emphasis

added).

Accordingly, because the $2 million award for Hardick's

pain and suffering and the $1.15 million award for Mrs.

24

Hardick's loss of society represent nonpecuniary damages, we hold that the trial court erred by permitting the jury to award Mrs. Hardick these nonpecuniary damages for the wrongful death of Hardick, a seaman.

### C. The Trial Court's Rulings Regarding the Admissibility of Certain Evidence

JCI's second assignment of error states, in part, that the trial court erred "in allowing [Mrs. Hardick] to introduce evidence of asbestos exposure from gasket removal, where [Mrs. Hardick] did not prove that any gasket removed was more likely than not a gasket supplied by JCI." However, JCI made a different argument on appeal, which is clearly stated in its Reply Brief as follows: "a plain reading of the entire Second Assignment of Error, the arguments advanced in the trial court, and JCI's Opening Brief makes clear that JCI is challenging the sufficiency of [Mrs. Hardick's] evidence." (Emphasis added.) Whether evidence is admissible is a separate issue from whether that evidence is sufficient.

Rule 5:27, titled "Requirements for Opening Brief of Appellant," requires that "[t]he opening brief of the appellant . . . must contain . . . [t]he standard of review, the argument, and the authorities relating to each assignment of error." The failure to comply with the requirements of Rule 5:27 results in waiver of the arguments the party failed to make. See Andrews

25

v. Commonwealth, 280 Va. 231, 252, 699 S.E.2d 237, 249 (2010) (citing prior versions of Rules 5:17 and 5:27 for the proposition that the "[l]ack of an . . . argument on brief in support of an assignment of error constitutes a waiver of that issue"); Jay v. Commonwealth, 275 Va. 510, 519, 659 S.E.2d 311, 316 (2008) (stating that, "[w]hen an appellant fails to comply with Rule 5:17(c)[(6)], this Court generally treats the argument as waived").[10]

Accordingly, we hold that JCI has violated Rule 5:27 by failing to include any "argument" or "authorities relating to" the trial court's "allowing [Mrs. Hardick] to introduce evidence of asbestos exposure from gasket removal."  (Emphasis added.) Consequently, JCI has waived these arguments on appeal.

JCI's second assignment of error also complains of the trial court's "precluding JCI from introducing circumstantial evidence of Hardick's exposures to asbestos-containing products supplied by other entities."  Specifically, JCI argues that the trial court improperly excluded: (1) a United States Navy "Qualified Products List . . . displaying the names and model numbers of the gaskets found on board Navy ships"; (2)

---

[10] Andrews and Jay relied on prior versions of Rules 5:17 and 5:27 for the proposition stated above.  280 Va. at 252, 699 S.E.2d at 249; 275 Va. at 519, 659 S.E.2d at 316.  However, former Rules 5:17 and 5:27 were amended following our opinions in Andrews and Jay, and the proposition stated above is now entirely supported by Rule 5:27(d).  See also Rule 5:17(c)(6).

"certified ship records from the National Archives indicating the presence, location and types of insulation and other asbestos products aboard Hardick's ships"; (3) "the then-existing military standards and specifications for these products during the relevant time period"; and (4) "photographs of the interior spaces of Hardick's ships depicting the products . . . that Hardick had been exposed to in his career."

Prior to trial, Mrs. Hardick filed a motion in limine, requesting that the trial court prohibit Hewitt

> from giving speculative and misleading testimony
> and showing misleading photographs . . . or
> other materials regarding type and amount of
> insulation to which Hardick may have been
> exposed. . . . from offering testimony that the
> Navy prohibited manufacturers from warning of
> the hazards of their products to circumvent this
> Court's consistent rulings striking the
> government contractor defense [and] from
> testifying about "Navy state of the art" in an
> attempt to circumvent this Court's consistent
> rulings striking the intervening negligence
> defense.

Following a pretrial conference at which Mrs. Hardick's motion in limine was argued, the trial court granted Mrs. Hardick's motion regarding Hewitt and prohibited Hewitt from testifying about "the knowledge and/or negligence of the Navy, that the Navy prohibited manufacturers from warning of their products' hazards, or about 'Navy state of the art.'" The trial court also ruled "that the knowledge and/or negligence of

the Navy is irrelevant and inadmissible."  The trial court

further stated:

> The parties agree that Hewitt may testify on the
> basis of documents that he has reviewed and
> produced about other products to which Mr.
> Hardick may have been exposed provided that (i)
> [JCI] proffers such evidence to [Mrs. Hardick's]
> counsel and the Court prior to Mr. Hewitt's
> testimony, and (ii) that [JCI] ties such
> exposure directly to Mr. Hardick.

(Emphasis added.)

At trial, JCI attempted to call Hewitt as a witness and

submitted that he would testify on various issues related to the

United States Navy.  Specifically, JCI submitted that Hewitt

would testify to: (1) "Hardick's Navy service generally"; (2)

"Hardick's ships," and the "types of pipes and valves that are

common to every Navy vessel of that [era or] vintage"; (3) the

"types of unions and gaskets" used on Navy vessels; (4) a United

States Navy "qualified products list for compressed sheet gasket

material"; (5) "the types of insulating materials that were

present aboard Navy vessels . . . of that era or vintage"; and

(6) the state of the art or "Navy-knowledge issue."

Mrs. Hardick objected to Hewitt's testimony based, in

part, upon JCI's stipulation that Hewitt would "not opine about

Hardick's exposure to asbestos, a subject that more

appropriately falls within other expert[s'] fields."  (Emphasis

in original.)  Mrs. Hardick argued that Hewitt admitted at his

28

pre-trial deposition testimony that he could not testify about any specific repairs or job on any of Hardick's ships, and that he had no personal knowledge concerning any specific environment in which Hardick worked.  Additionally, Mrs. Hardick argued that,

> Hewitt did not serve on any of Mr. Hardick's ships during the relevant time.  He didn't do the same type of work as Mr. Hardick.  He admitted he had no training whatsoever as a shipfitter/pipefitter.
> . . . He served not on surface ships, only on submarines.  And he agreed that he can't link up anything to Mr. Hardick with his documents or with his personal experience.

Mrs. Hardick also argued that none of the photographs JCI sought to introduce through Hewitt were of any of the ships Hardick served or worked on.

In response to the parties' arguments, the trial court specifically asked JCI, "can you tie any of [Hewitt's] testimony directly to any ship that Mr. Hardick served on?"  JCI responded that it could demonstrate, through Hewitt's testimony and the documents upon which his testimony would be based, "the types of insulation that were on the ships when [they] were originally constructed" and "that the preferred insulation for particular products happened to be one thing or the other."  In response to JCI's answer, the trial court initiated the following exchange:

> [Trial Court]: Do we know what it was, though,
>                         on the ship?

29

```
[JCI]:            No.

[Trial Court]: It could be one thing or another.
               Do we know what the one thing or
               another actually is?

[JCI]:            Your Honor, I don't believe there
                  is any way on earth to be able to
                  say that . . . that is what it
                  is. . . . in order to tie [any]
                  particular product to Mr. Hardick
                  on any given occasion, if that's
                  what the Court is asking me,
                  that, I believe, is an impossible
                  task.

[Trial Court]: Okay.  I'm looking for Hardick-
               specific evidence.  That's what
               I'm looking for.
```

The trial court ruled that, because JCI

> can't connect [any of Hewitt's proposed
> testimony] up directly to Mr. Hardick, then it's
> not appropriate.  It's irrelevant.
> . . . What the Navy knew, state of the art for
> the Navy is not proper to be interjected into
> this case.  And . . . the reasons that . . .
> that you stated that you want to put Mr. Hewitt
> on for, unless you can tie it directly to Mr.
> Hardick, it's not relevant.

Specifically, the trial court ruled, with regard to the

qualified products list, that

> the fact that there is a list of possible
> vendors that the Navy might use calls for
> speculation and conjecture as to whether or not
> they were on any of Mr. Hardick's ships.
>
> . . . .
>
> You can't go on speculation and conjecture.  And
> so I think that unless you can link it up to Mr.
> Hardick, it's not appropriate.

It is well-settled that we "review a trial court's decision to exclude evidence for an abuse of discretion, and we will not disturb a trial court's evidentiary ruling absent an abuse of discretion." Kimble, 279 Va. at 662, 691 S.E.2d at 796. Furthermore, "[a] great deal must necessarily be left to the discretion of the [trial court] in determining whether evidence is relevant to the issue or not. Evidence is relevant if it has any logical tendency to prove an issue in a case." Avent, 279 Va. at 197-98, 688 S.E.2d at 257 (quoting Jones, 274 Va. at 590, 650 S.E.2d at 855). In this case, the trial court found that Hewitt's testimony and the documents upon which his testimony would have been based were irrelevant and speculative because Hewitt could tie neither the documents at issue nor any of his personal experience directly to Hardick. Accordingly, we hold that the trial court did not abuse its discretion when it excluded Hewitt's testimony and the documents upon which his testimony would have been based as speculative and irrelevant.

### III. Conclusion

We hold that the trial court erred by allowing the jury to award Mrs. Hardick nonpecuniary damages for the wrongful death of Hardick, a seaman. We also hold that: (1) JCI waived part of its second assignment of error by failing to include any "argument" or "authorities relating to" the admissibility of Mrs. Hardick's evidence regarding asbestos exposure from gasket

31

removal, in violation of Rule 5:27; and (2) the trial court did not abuse its discretion when it excluded Hewitt's testimony.

Accordingly, we will affirm in part and reverse in part the judgment of the trial court. We will vacate the $2 million award for Hardick's pain and suffering and the $1.15 million award for Mrs. Hardick's loss of society and remand the case to the trial court for entry of an order consistent with this opinion.

<u>Affirmed in part,
reversed in part,
and remanded</u>.